**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
HUI LI,                                                                    :
                                                                               :
                                            Plaintiff,            :        Civil Action No. 1:22-cv-09309-KPF
                                                                               :
                        v.                                                 :
                                                                               :        **AMENDED COMPLAINT**
CHINA MERCHANTS BANK CO., LTD. and            :
KANG PAN, in his individual and professional      :
capacities,                                                          :        **Jury Trial Demanded**
                                                                               :
                                            Defendants.        :
-------------------------------------------------------------X

Plaintiff Hui Li hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Despite citing to its employees "many cultures and experiences" as being central to its success, China Merchant Bank ("CMB"), and particularly its New York branch ("CMBNY" or the "Bank") has historically proven that it only values one type of employee – young, male Chinese citizens, all of whom CMB describes as "first-tier" employees.  It is those employees who receive the best positions, the highest compensation and the most opportunities for advancement within the organization.  Everyone else is considered a second-class employee, unworthy of the same treatment.

2.      CMBNY's female employees are especially singled out for mistreatment by the largely male members of management.  Several senior male managers, including its highest leaders, have engaged in inappropriate sexual relationships with subordinates and harassed female employees when they refused to participate in such liaison.

3.      Any woman who complained about such conduct was met with open hostility when the Bank closed ranks to protect the reputation of its male, Chinese managers.  On one

1

such occasion, when a female employee complained about being sexually harassed by a male leader of CMBNY (a man who had harassed at least three other women), CMB allowed him to transfer to a leadership position in a different location.  In contrast, Mr. Kang Pan (the General Manager of the Bank), told the Bank's employees to ostracize the female employee who had complained because she deserved to be punished for lodging a complaint with HR.

4.      Women were not the only employees singled out for discriminatory treatment at CMBNY.  The Bank also made no secret of its contempt for non-Chinese employees and for older employees.  By way of example only, Mr. Pan told Ms. Li that it was "natural" for CMB to be "on guard" and "suspicious" of "naturalized" employees and employees with "green cards." According to Mr. Pan, he was expressing the belief commonly held throughout the Bank, that non-Chinese citizens could not be trusted and were not loyal to CMB.

5.      Similarly, CMB's HR manual explicitly states that, for employees below the Assistant Department Head and Assistant GM level at branches, men over 55 and women over the age of 50 "**must be moved to a non-leadership position**."  Similarly, in a town hall meeting in 2018, Mr. Huiyu Tian (the former President of CMB) made clear that he believed that the Bank "**should let young people**" dictate the future of CMB.

6.      As an older, female American citizen, Ms. Li faced almost daily reminders of her inferiority in the eyes of CMB, particularly from Mr. Pan.  Despite an outstanding track record and unblemished performance history, Ms. Li found herself stripped of the most important job responsibilities associated with her role as the Head of the General Office Department, which were instead given to a younger, male Chinese employee.  Instead, Ms. Li was given menial tasks such as serving tea to visitors and cleaning conference rooms.  Mr. Pan also publicly demeaned Ms. Li in front of her colleagues, falsely claiming that she was incapable of

performing her job and threatening to terminate her employment.  When Ms. Li complained about this discriminatory conduct, she was promptly given the worst performance review of her career and was demoted.

7.      Finally, after Ms. Li engaged counsel to pursue her legal rights and did not waive her claims against Defendants, her employment was summarily terminated, completing the vicious retaliatory cycle to which CMB had subjected her.

8.      Defendants terminated Ms. Li's employment less than 24 hours after she had informed them that her doctor had mandated that she take leave under the FMLA due to the anxiety and depression brought about by their unlawful conduct.

9.      Defendants' misconduct violates numerous laws, including Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"); and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 *et seq*. ("NYCHRL").

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant China Merchants Bank Co., Ltd., New York Branch's headquarters are located within the Southern District of New York and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

12.     Pursuant to NYCHRL § 8-502, a copy of this Complaint will be served upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within 10 days of its filing, thereby satisfying the notice requirements of that section.

13.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

14.     Plaintiff Hui Li is an American citizen and resident of Riverside, Connecticut.   At all relevant times, Ms. Li met the definition of an "employee" under all applicable statutes.

15.     Defendant China Merchants Bank Co., Ltd. is an international Chinese bank, headquartered in Futian District, Shenzhen, Guangdong, China, which primarily engages in corporate and retail banking and treasury operations.   CMB is one of the largest banks in China with approximately 500 branches and is indirectly controlled by the Government of China through a number of wholly owned companies.   CMBNY is located at 535 Madison Avenue, New York, New York 10022.   At all relevant times, China Merchants Bank Co., Ltd. has met the definition of an "employer" of Plaintiff under all applicable statutes.

16.     Defendant Kang Pan is, upon information and belief, a citizen of the People's Republic of China, but resides in New York.   Mr. Pan is employed by CMBNY as its General Manager and had direct authority over the terms and conditions of Plaintiff's employment.   In this position, Mr. Pan was a direct participant in the retaliatory and discriminatory policies and conduct to which Ms. Li was subjected.   At all relevant times, Mr. Pan met the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.    MS. LI'S PROFESSIONAL BACKGROUND

17.    Ms. Li is a distinguished professional with almost 20 years of experience working in a variety of third-party risk management, corporate governance and compliance risk management roles.

18.    After receiving her MBA from Pennsylvania State University in 2004, Ms. Li worked for various large international high-tech corporations and financial institutions.

19.    In October 2012, CMB recruited Ms. Li as an important addition to its head office located in Shenzhen (the "Head Office"), China.

20.    Ms. Li excelled in this role, earning outstanding performance reviews and praise for her own job performance and her leadership in managing her team.

21.    After approximately one year, Ms. Li sought to return to the United States and requested to join CMBNY as a result.

22.    CMBNY rewarded her with the position of the Deputy Head of the combined Human Resources ("HR") and General Office Department.

23.    Ms. Li outperformed all expectations in her new position, with her manager taking particular note of the ways in which she made other employees feel comfortable and put the Bank in the best position to succeed.

24.    In 2016, Ms. Li put in for a transfer to the Deputy Head of Compliance position, which she received.

25.    In 2018, CMBNY decided to separate the HR and the General Office Department's functions, which had previously been combined into one group, into two separate business lines.

26.    During this process, CMBNY asked Ms. Li to lead the new standalone General Office Department, a significant promotion reflecting her five years of impeccable performance at CMB and CMBNY.

27.    Upon being named the Head of the General Office Department, Ms. Li spearheaded an initiative to improve the corporate culture at CMBNY, which had been a notable weakness at the Bank for years.

28.    Ms. Li successfully advocated for the Bank to spend more time and resources on activities designed to improve the workplace culture.

29.    She and her team also initiated a process to enhance the Bank's communication mechanisms and to increase the transparency of the communication across the Bank.

30.    For example, she and her team set up regularly-held townhall meetings, which allowed employees to anonymously raise questions or concerns.

31.    As a result of her successful transition to Department Head, Ms. Li was soon asked to attend meetings of CMBNY's Executive Committee, where she was allowed visibility and input into all of the Bank's larger strategic decisions.

32.    Throughout her employment, Ms. Li never had any issues adapting to the challenges posed by any of her new positions.  Regardless of her title or supervisor, her performance reviews were uniformly outstanding, with Ms. Li always earning ratings of A1 or A2 (or, on one occasion, A3), the highest possible ratings available at CMB.

33.    Similarly, both her supervisors and colleagues consistently praised her for her valuable contributions and attempts to improve the culture of CMBNY.

34.    At CMBNY's 10th Anniversary Celebration in 2018, the Branch recognized all employees who had obtained A-ratings for at least three consecutive years.

35.     Only approximately 10% of employees were awarded with this honor, and Ms. Li was one of them.

36.     In sum, Ms. Li was nothing short of a stellar employee.

37.     While Ms. Li was unquestionably an outstanding employee, she performed her job despite being subjected to an environment riddled with discrimination, oppression and mistreatment – and where a strict hierarchy places women, non-Chinese citizens, older people and other minorities as targets for harassment.

## II.    THE CULTURE OF DISCRIMINATION AND HARASSMENT AT CMB AND CMBNY

### A.    CMBNY's Discriminatory Attitude Towards Female Employees

38.     CMBNY's female employees are routinely targeted for mistreatment and regarded as inferior to their male counterparts.

39.     For example, Defendant Pan told Ms. Li that he does not believe female employees were "suitable" for high pressure jobs.

40.     To underscore his point, he claimed that one of Ms. Li's direct reports, Lynn Zhao (a Manager in the General Office Department), was ultimately unfit to perform her job.

41.     According to Mr. Pan, although Ms. Zhao is "**cute**," and "**her small face would look pretty in front of camera**," she is "frightened to death" when handling high pressure work and cannot be relied upon.

42.     Similarly, soon after he became General Manager, Mr. Pan announced during a team-building happy hour that he did not want female employees to wear short skirts because it would "**get his attention**."

43.     Mr. Pan claimed that "this strategy would not work" on him.

44.     These gratuitous comments about Ms. Zhao's looks and the way in which he believes all women dress make it clear that Mr. Pan viewed women as nothing more than "window decoration" who have nothing to contribute besides their outward appearance.

45.     In one of Mr. Pan's first meetings with Ms. Li, he questioned her on why the General Office Department was made up entirely of female employees, claiming that they would waste too much time engaging in "gossip" rather than discussing business issues.

46.     Mr. Pan pointed to the Executive Assistant Team of the General Office Department at the Bank's Head Office as an example that they should strive to emulate. According to Mr. Pan, that Executive Assistant Team was comprised entirely of men.

47.     He then told Ms. Li that he would fix this "problem" unique to female employees by hiring as many young men as possible to fill out the General Office Department at CMBNY.

48.     This preference for male employees extends beyond the General Office Department.

49.     Women at CMBNY were routinely demoted and passed over for promotions in favor of men, many of whom are less qualified.

50.     By way of example, Betty Yu (the then-Head of the Investment Banking Department) applied for the role of the Head of the Financial Institutions Group.

51.     As part of the application process, each candidate was required to make a presentation to the Branch's Executive Committee explaining their vision for the Financial Institutions Group and how they intended to grow it in the future.  The Executive Committee then voted to select the team's new Head.

52.     Mr. Pan told Ms. Li that he had approached at least one member of the Executive Committee and said specifically not to vote for Ms. Yu – who was the only female candidate

over 40 – as she was the only candidate who did not have his support.  The position ultimately

went to a younger male candidate.  Incredibly, Ms. Yu was *demoted* to a non-managerial position

as part of a supposed reorganization and forced to accept a 30% salary cut in the process.

53.    Mr. Pan also discriminated against two former female executives on the Executive

Committee, Mu Zhang and Marina Li.  During meetings of the Executive Committee, which Ms.

Li attended in her capacity as Head of the General Office Department, Mr. Pan was noticeably

rude and dismissive towards these women.  He constantly interrupted them and failed to pay

attention to their ideas, making clear that he did not respect their opinions.  This was in stark

contrast to his treatment of the male executives attending these meetings, whom Mr. Pan praised

and lavished with attention.

**B.    The Bank's Prejudices Towards Non-Chinese Citizens**

54.    CMBNY, and Mr. Pan in particular, also blatantly favored Chinese citizens over

non-Chinese citizens.[1]

55.    Mr. Pan spoke often about his hostility towards individuals who are not Chinese

citizens and particularly employees who immigrate to the United States with the hope of

becoming naturalized.

56.    On one such occasion, in October 2019, Mr. Pan was pressuring Ms. Li to violate

the Bank's internal policies concerning providing expensive alcohol and gifts to visitors from the

Head Office.  When she refused to do so, he responded:

> The things about you are complicated. ***You were naturalized, you
> are local people, and with all the green cards and stuff,*** so it comes
> very…very ***natural for Cheng Zhang to be on guard against you
> for all the time.***  Can you do office work? ***Are you of one mind with
> the bank?***  We need to make it clear.  ***People find you suspicious,
> they don't think you are of one mind with them.***

---

[1]    Ms. Li was an American citizen throughout her employment with CMBNY.

57.    Mr. Pan was communicating his belief (a belief that he admitted is shared by Cheng Zhang (the then Head of HR of the Head Office) and others in management), that CMBNY did not trust individuals who are not Chinese citizens.  Further, the Bank was "on guard against" non-Chinese citizens and questions their loyalties.

58.    This unlawful animus even extended to individuals who were born in China and were of Chinese descent, such as Ms. Li.

59.    Mr. Pan often accused these employees of not working as hard as employees who were Chinese citizens because such naturalized employees thought their green cards protect them from the Head Office in some way.

60.    Discrimination against non-Chinese citizens was a *widely* accepted practice at the Bank.

61.    The Bank's leadership appeared to view those who were not Chinese citizens as somehow being disloyal to China and therefore to the business.

**C.    CMB Discriminates Against Older Employees**

62.    Older employees were also the subject of open discriminatory hostility.

63.    In fact, CMB's written HR policies explicitly stated that for leaders at the levels below Assistant Department Heads of the Head Office and the Branch's executive level, it is a "requirement" that men over 55 and women over the age of 50 must be moved to "**a non-leadership position**."

64.    Conversely, the Company's HR Department emphasized the need to "adhere to the orientation on promoting young cadres."

65.     Similarly, at a town hall meeting in 2018 which Ms. Li attended, Mr. Tian made clear that he believed that the Bank "**should let young people**" dictate the future of the Company.

66.     Mr. Tian reiterated his preference for younger employees when he published a document entitled, "A Letter to the Young Staff of the Bank."  In it, he said, "**today's China Merchants Bank attaches more importance to the voice of young people than ever before**," and praises them for "**continuously injecting fresh blood into the bank's employees**."  He further explained that older people need to recognize that "there are many problems we can't understand" and the only way to solve them is to "**learn from young people and let young people speak freely . . . yes, let young people speak freely and let young people speak boldly**."

67.     In an environment where the most powerful employee of the Bank openly espouses a preference for "young people" and "fresh blood," it is no surprise that CMB consistently seeks to push out older employees for their younger counterparts.

68.     In fact, in 2020, CMBNY held its annual executive briefing session, which was attended by all of CMBNY's managers, including Ms. Li.  These executives took turns discussing their accomplishments from the previous year.  When it came time for Mr. Pan to speak, he boasted about the fact that he was able to transition to a "**very young team**" as one of his primary achievements.

69.     Indeed, CMB and CMBNY, and Mr. Pan in particular, have emphasized the need to select younger employees for advancement while, at the same time, pushing older employees to retire to make more senior positions available.

70.    By way of example only, in 2020 (and as will be detailed below), Ms. Li was replaced as the Head of the General Office Department by Harry Hu, a male employee who is younger than 40 years old.  Mr. Hu was promoted at least ***three levels*** to fill Ms. Li's role, despite the fact that he clearly lacked the relevant experience.

71.    Similarly, the Bank filled the role of the Head of the newly created Financial Institutions Department with a man who was younger than 40 years old, Danny Song.  In the process, several employees who were over 40 years old were bypassed entirely.  On another occasion, CMBNY complained about the Head Office's decision to relocate a woman in her 40s to CMBNY's Private Banking Department, claiming that she was underperforming "compared with younger account managers."

### D.    The Sexual Harassment of Female Employees

72.     In early September 2019, Mr. Pan engaged Ms. Li in numerous conversations about incidents of sexual harassment within CMB and CMBNY.  Even though Ms. Li told Mr. Pan that she felt uncomfortable having to discuss such subjects, Mr. Pan persisted.  Mr. Pan gave examples of how Head Office executives engaged in sexual relationships with female employees and claimed that such relationships could develop into something romantic for both parties.  According to Mr. Pan, the key to making such relationships successful was for the male employees to take "good care" of their female subordinates to prevent them from lodging complaints down the road.

73.    Ms. Li found such statements, which openly excused sexual harassment by supervisors over their subordinates, to be deeply offensive.

74.    Mr. Pan further told Ms. Li that a former senior leader at CMBNY had sexually harassed several female employees.

75.    As an example, Mr. Pan told Ms. Li that one of this leader's "dotted line" reports had informed CMBNY that this senior leader had made unwanted sexual advances towards her. According to Mr. Pan, this female employee complained that the male senior leader had been drinking heavily one night, after which he had messaged her, pressuring her to get a hotel room with him so that they could have sexual relations.  When the female employee refused, the male senior leader was undeterred and continued to send her messages, telling her that he missed her. Mr. Pan added that CMBNY had a written record of this male senior leader's harassment in the form of the messages that he had sent to the female employee.  Mr. Pan openly admitted that this sexual harassment costs the bank millions of dollars in settlement payments and investigations. Despite this fact, Mr. Pan told Ms. Li that CMB was continuing to protect the male senior leader.

76.    Specifically, CMB refused to terminate the male senior leader for his grossly inappropriate conduct and offered him a leadership position at a different location of CMB and continued to pay him his salary.

77.    Mr. Pan also openly spoke with Ms. Li about CMB's attempts to suppress other complaints of discrimination in an effort to avoid a public scandal.  By way of example only, Mr. Pan told Ms. Li that several other female employees had all told Mr. Pan that they, too, had been subject to unwanted sexual advances by the same senior male leader.

78.    Mr. Pan further explained to Ms. Li that he had successfully discouraged another female employee from disclosing this male senior leader's misconduct towards her by effectively bribing her with a promotion.

79.    Specifically, Mr. Pan arranged to promote this second female employee to a position for which he admitted she lacked the necessary qualifications.  In order to disguise the female employee's lack of qualifications, Mr. Pan told her that he would have the female

employee assume the role on a temporary basis for a year to give the impression that she earned the promotion on merit when he made the promotion permanent a year later.

80.    Ms. Li confronted Mr. Pan regarding the way he dealt with the situation.  Mr. Pan admitted that if more than one woman complained about sexual harassment, CMBNY was worried it would become a "target of the #MeToo movement," which the Bank wanted to avoid at all costs.  He also told Ms. Li that he had refused to escalate the other women's complaints that they too had been sexually harassed by the same male senior leader to similarly avoid any #MeToo repercussions.

81.    Mr. Pan further told Ms. Li that the male senior leader was not the only one in CMBNY that had sexually harassed CMBNY's female employees.  A few employees had complained that another male senior executive of CMBNY had drunkenly groped several female employees at a summer outing.[2]  Once again, Mr. Pan refused to take any action in response to those complaints.

82.    To the contrary, Ms. Pan told Ms. Li that he thought that people who went to HR deserved to be punished and that senior management shared his belief, a fact that they openly communicated.  For example, Mr. Pan repeatedly complained about how much money internal investigations were costing CMBNY, calling them a waste of time and money.

83.    Similarly, right after Mr. Pan joined CMBNY, CMBNY's internal legal counsel and a member of the HR Department both told Mr. Pan not to solicit feedback in writing from employees because it would provide such employees with an opportunity to complain about

---

[2]    This same senior executive also told a few employees that he saw the former senior leader grope a female employee at a happy hour event during the previous spring, but that he did not make any attempt to stop this misbehavior or report it to management when it happened because he was worried about being subject to retaliation.  Thus, even senior male employees did not feel comfortable making complaints in the hostile environment fostered by the Bank.

misconduct.  This, in turn, would lead to more investigations, which could reveal other potentially improper, or even illegal, conduct.  The Branch wanted to avoid such revelations at all costs.

84.     In keeping with this sentiment, upon assuming the role of General Manager, Mr. Pan instructed Ms. Li and others that they should ignore the female employee who had informed CMBNY about the former senior leader's sexual harassment and refrain from speaking with her. He told Ms. Li that the female employee deserved to be punished for filing a complaint with HR about the former senior leader because of the issues it had caused the Bank.  As such, according to Mr. Pan, that female employee deserved to be isolated as a warning to other employees who were considering making similar complaints.

85.     On another occasion, Mr. Pan told Ms. Li that an executive from the CMB Head Office was involved in a sexual relationship with a former CMBNY employee.  Mr. Pan claimed that several CMBNY executives knew about the relationship and allowed it to continue.  In fact, the female employee was later transferred to one of CMB's branch locations so she could be closer to the Head Office executive, making it easier for them to continue their relationship.

86.     The CMB Head Office executive was not the only employee who was having an inappropriate relationship with a subordinate.  Mr. Pan told Ms. Li that one of the existing senior executives at CMBNY also had a sexual relationship with one of his subordinates.  Again, no action was taken.  In fact, when an employee attempted to confront the male senior executive about his inappropriate behavior, the male senior executive began retaliating against her.

### III.    MS. LI HAS BEEN SUBJECT TO DISCRIMINATION ON THE BASIS OF HER GENDER, AGE AND CITIZENSHIP

87.    In an environment so rife with discriminatory animus by the senior-most members of management, Ms. Li herself has had her steady rise through the Bank's ranks halted because of similar treatment.

88.    As a woman who is over 40 years old and an American citizen, Ms. Li unfortunately shares many of the protected characteristics that the Bank, and particularly Mr. Pan, regarded with open hostility.

89.    For example, in May 2019, Ms. Li was issued a written warning because of her supposedly "demanding" management style, which was based, in part, on events that had occurred over a year prior to the warning being issued.

90.    Obviously, complaints about women being "aggressive" or, in this case, "demanding," are merely thinly-veiled critiques targeting outmoded stereotypes about how women should behave.

91.    No man would be similarly criticized, let alone been *formally disciplined*, for such conduct.

92.    Ms. Li noted as much when she sent Mr. Jiao a written objection to her warning in which she stated:

> There is no law prohibiting a "demanding" management style.  In many circumstances, such a style is viewed as an asset.  ***Is my management style considered inappropriate in my case because I am a Chinese woman***?

93.    After Mr. Pan replaced Mr. Jiao, he made no effort to conceal his discriminatory feelings towards Ms. Li.  Shortly after Mr. Pan informed Ms. Li about his intention to hire more male employees to join the General Office Department, he followed through on his threat by

bringing on Harry Hu, who was, again, a male Chinese citizen who was younger than 40 years old, as an Executive Assistant in the General Office Department.

94.     Tellingly, despite the fact that Ms. Li was the Head of the General Office Department at the time and Mr. Hu was supposed to be reporting to her, she was not even informed of the decision to hire Mr. Hu until she received the announcement from HR.  Instead, Mr. Pan made the unilateral decision to bring Mr. Hu into the General Office Department.  Mr. Pan then summarily informed Ms. Li that Mr. Hu would be reporting directly to him, bypassing Ms. Li entirely.

95.     Mr. Pan also gave Mr. Hu his own office, which was normally only reserved for Department Heads.  Fang Huang, a female employee who was the Executive Assistant for Mr. Pan prior to Mr. Hu, on the other hand, was only given a regular cubical.

96.     Upon joining the General Office Department, Mr. Hu's presence had the effect of further marginalizing Ms. Li, as he assumed many of her most important tasks at Mr. Pan's direction.  For example, Mr. Pan informed Ms. Li that she would no longer be permitted to attend Executive Committee meetings, where all of the important decisions regarding the governance of CMBNY were discussed.  Instead, to the extent that Ms. Li needed to know what was discussed at the Executive Committee meetings, she would have to ask Mr. Hu, who would attend such meetings in her stead.

97.     Similarly, Mr. Pan told Ms. Li that she could no longer view his business agenda, which set forth all of his important meetings, as well as visits from key personnel from the Head Office.  Mr. Pan told her that only Mr. Hu would be allowed to access such information, and that she would have to ask Mr. Hu if she wanted any insight into Mr. Pan's schedule.  Ms. Li would essentially have to seek her subordinate's permission if she wanted information that was

essential to her job.  It was obvious to Ms. Li and others in the General Office Department that

Mr. Pan had brought on Mr. Hu to be groomed as her replacement.

98.    In keeping with Mr. Pan's opinions that women cannot handle stressful roles and

are better served performing administrative tasks, Ms. Li's executive-level assignments were

soon replaced by work befitting an assistant.  To that end, Mr. Pan told Ms. Li on several

occasions that he preferred it when Ms. Li served guests coffee and tea rather than Mr. Hu,

despite the latter being his Executive Assistant.

99.    On another occasion, prior to a meeting with clients, Mr. Pan supposedly found

dust in the conference room that was to be used and then told Ms. Li that he expected her to

clean the conference room herself.  Mr. Pan went so far as to tell Ms. Li in front of other

employees that she was in danger of losing her job if she failed to clean the conference room

properly, further undermining her standing within CMBNY and making it impossible for her to

effectively manage her team.

100.    As another example, Mr. Pan loudly berated Ms. Li, causing her to run out of his

office in tears, in front of her colleagues, humiliating her.

101.    Under Mr. Pan's direction, Ms. Li, a decorated and valuable executive employee,

was reduced to performing work that would be beneath an administrative assistant.

102.    Mr. Pan also instructed Ms. Li to violate the Bank's policies on numerous

occasions.  By way of example, he informed Ms. Li that serving the personal needs of Mr. Tian

and his family in the U.S was more important than following any of the Bank's policies.  As an

example, Mr. Pan requested that Ms. Li create forged inventory records indicating that expensive

bottles of Chinese alcohol (Maotai) were given to customers when they had been, in fact,

consumed by executives from the Head Office or moved to Mr. Pan's apartment for his personal

consumption.  Mr. Pan emphasized that he and executives from the Head Office enjoyed drinking Maotai (even though it is forbidden by Chinese regulators), and it was therefore important that Ms. Li help him facilitate such conduct.  He also claimed that when he had previously paid for a business trip in China, Mr. Tian drank Maotai with him and that Mr. Tian often drinks expensive bottles with a small group of head office executive members.

103.    On another occasion, he required Ms. Li and another employee to accompany him to the Bank's Storage Room where it maintained gifts to be given to important clients.  While there, he selected 16 gifts valued at more than $1,000 and asked Ms. Li to put them in a suitcase for him to bring home to his family as Christmas gifts.

104.    He then instructed Ms. Li that she needed to fill out the paperwork claiming that the gifts were given out in the course of normal business to customers and for other marketing purposes.

105.    When Ms. Li pushed back on these practices, Mr. Pan erupted, blaming her failure to unquestioningly follow his orders on the fact that she was not a Chinese citizen. According to Mr. Pan, he could only trust Chinese employees with the most delicate tasks, and the fact that Ms. Li had become a naturalized American citizen meant that he could no longer rely on her.

## IV.    CMBNY RETALIATES AGAINST MS. LI IN RESPONSE TO HER COMPLAINTS OF DISCRIMINATION

106.    After months of Mr. Pan's repeated abuse and open discrimination towards herself and others on account of their age, citizenship status and gender, Ms. Li realized that she needed to take action to address her mistreatment.

107.    As a result, in early January 2020, Ms. Li complained to Mr. Pan about the discrimination to which she had been subjected and the fact that she could no longer tolerate his

behavior.  She therefore wanted to discuss the possibility of him changing his behavior or potentially transferring to another Department, as a last resort.  CMBNY began retaliating against Ms. Li almost immediately.

108.    In December 2019, Ms. Li had met with Mr. Pan to discuss her year-end performance review.  During this conversation, Mr. Pan told her that he believed that her performance over the previous year had been great.  However, after she had complained, Ms. Li received the lowest performance rating of her career in her written review.

109.    Specifically, whereas she had previously only received ratings that were in the A-level, which were the highest available ratings at CMBNY, her rating for 2019 was downgraded to a B1.  Her bonus was also cut almost in half from what she received in 2018.

110.    Mr. Pan then told Mr. Joseph Loffredo (the Deputy General Manager of CMBNY) to transfer Ms. Li to the Legal and Compliance Department and to demote her to the role of Deputy Head because, he falsely claimed, she could not handle the pressure of working as the Head of the General Office Department.  This claim is categorically untrue.  By falsely informing the Executive Committee that Ms. Li was being transferred due to her inability to perform the tasks of the Head of the General Office Department, Mr. Pan was clearly spreading his own discriminatory beliefs that women could not handle difficult jobs.

111.    Moreover, he was making a concerted effort to malign Ms. Li's reputation within CMBNY, virtually guaranteeing that she would never be permitted to fill a role as a Department Head again.

112.    Based on Mr. Pan's false accusations, CMBNY summarily informed Ms. Li that it would be transferring her to the Legal and Compliance Department as a Deputy Head.  In this new position, Ms. Li became the secondary Deputy Head, as there was already a Deputy Head in

place in the Legal and Compliance Department, further reducing her responsibilities.  Moreover, her base compensation was reduced by almost 20% in connection with the transfer.

113.    In contrast, another Department Head who was also demoted – but who was a Chinese citizen – did not have his compensation cut.  Ms. Li was told by Mr. Pan that the Bank's offer was a "take it or leave" proposition, with the understanding that Ms. Li would lose her job in the event she declined the offer.

114.    Understandably feeling as if she had no choice, Ms. Li accepted this humiliating demotion.

115.    However, CMBNY's retaliatory treatment of Ms. Li did not end with the transfer. By way of example only, despite being a Deputy Head, Ms. Li was never given a clear explanation as to her role or responsibilities.

116.    Moreover, shortly after her transfer was announced, the entire Legal and Compliance Department was informed that Ms. Li had been demoted and been forced to accept a salary cut.  The Legal and Compliance Department was further told that Ms. Li no longer had the support of the Executive Committee.  This critically undermined her reputation in her new role and emboldened other employees to ignore her requests to perform assignments.

117.    Whereas during Ms. Li's prior experience in the Compliance Department she was involved in the compensation review process for the Bank's employees and was allowed to participate in meetings with regulators, she was no longer permitted to participate in these meetings following her complaints of discrimination.

118.    Moreover, despite Ms. Li's continued requests, the Bank continued to refuse to explain her responsibilities to her.

119.    As a result of the repeated discrimination and retaliation which she experienced, Ms. Li retained counsel to protect her rights and institute a potential legal action against the Bank.   In March 2020, Ms. Li's counsel sent CMB a detailed letter describing Ms. Li's claims and the possibility that she would file a lawsuit.

120.    In response, CMB engaged in a bad faith negotiation, intending not to try to resolve the matter but to string Ms. Li along to prevent her from filing a lawsuit, further harassing her and frustrating her ability to vindicate her rights.   As part of this effort, CMB agreed to engage in a mediation in July 2020.

121.    In connection with this mediation, the Bank agreed to pay Ms. Li a sizeable sum of money in exchange for her agreement to, *inter alia*, release her valid discrimination and retaliation claims against Defendants and leave the Bank.

122.    However, CMB refused to finalize this deal further substantiating that CMB was at all times acting in bad faith, stringing Ms. Li along and trying to delay the filing of a lawsuit.

123.    Ms. Li then sought FMLA leave from CMB, explaining that the Bank's conduct had caused her to suffer from extreme anxiety and depression.

124.    CMBNY incredibly responded by abruptly terminating Ms. Li's employment on August 23, 2020 for plainly pretextual reasons.

125.    It is clear that CMB's decision to renege on its earlier settlement agreement, and to subsequently terminate Ms. Li's employment, was merely the culmination of a concerted effort by Defendants to punish a female employee who would not stay silent in the face of pervasive unlawful conduct.

## **FIRST CAUSE OF ACTION**
### **(Discrimination in Violation of Section 1981)**
### *Against All Defendants*

126.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

127.    Defendants have discriminated against Plaintiff on the basis of her citizenship in violation of Section 1981 by denying her the same terms and conditions of employment available to Chinese citizens, including by, *inter alia*, reducing her compensation, demoting her employment, stripping her of her job duties and terminating her employment.

128.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

129.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## **SECOND CAUSE OF ACTION**
### **(Retaliation in Violation of Section 1981)**
### *Against All Defendants*

130.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

131.    By the conduct described above, Plaintiff engaged in protected activity by complaining about Defendants' discriminatory conduct based on her status as a non-Chinese citizen.

132.    By the conduct described above, Defendants violated Section 1981 by taking adverse employment actions against Plaintiff in response to Plaintiff's protected activity, including, but not limited to, reducing her compensation, demoting her employment, stripping her of her job duties and terminating her employment.

133.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which she is entitled to an award of damages to the greatest extent permitted by law.

134.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Retaliation in Violation of the FMLA)**
***Against All Defendants***

135.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

136.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  At all times relevant herein, Defendants were and are "covered employers" within the meaning of the FMLA.

137.    Defendants violated the FMLA by unlawfully retaliating against Plaintiff for exercising rights protected by the FMLA by, *inter alia*, terminating her in retaliation for attempting to taking leave under the FMLA and subjecting her to an adverse employment action

that would reasonably dissuade a reasonable person from exercising rights protected by the FMLA.

138.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the FMLA, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

139.    Defendants' unlawful and retaliatory actions constitute bad faith, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

140.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

141.    Defendants have discriminated against Plaintiff on the basis of her gender, age and citizenship in violation of the NYSHRL by denying Plaintiff the same terms and conditions of employment available to younger, male, Chinese citizens.

142.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

143.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

144.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
*Against All Defendants*

145.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

146.    By the conduct described above, Plaintiff engaged in protected activity by complaining about the discriminatory conduct to which she was subjected on account of her gender, age and citizenship status.

147.    By the conduct described above, Defendants violated the NYSHRL by taking adverse employment actions against Plaintiff in response to Plaintiff's protected activity, including, but not limited to, reducing her compensation, demoting her employment, stripping her of her job duties and terminating her employment.

148.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which she is entitled to an award of damages to the greatest extent permitted by law.

149.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
*Against All Defendants*

150.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

151.    Defendants have discriminated against Plaintiff on the basis of her gender, age and citizenship in violation of the NYCHRL by denying her the same terms and conditions of employment available to younger, male Chinese citizens.

152.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

153.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.  Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
*Against All Defendants*

154.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

155.    By the conduct described above, Plaintiff engaged in protected activity by complaining about Defendants' discriminatory conduct based on her gender, age and citizenship status.

156.     By the conduct described above, Defendants violated the NYCHRL by taking adverse employment actions against Plaintiff in response to Plaintiff's protected activity, including, but not limited to, reducing her compensation, demoting her employment stripping her of her job duties and terminating her employment.

157.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which she is entitled to an award of damages to the greatest extent permitted by law.

158.     Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees, representatives or persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

B.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the applicable federal, state and city laws;

C.     An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, emotional pain and suffering and any other physical and mental injuries;

E.    An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F.    An award of punitive damages;

G.    An award of costs that Plaintiff has incurred in this action, as well as reasonable attorneys' fees to the fullest extent permitted by law; and

H.    Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 5, 2023
   New York, New York       Respectfully submitted,

                  **WIGDOR LLP**

                  By: _____
                   David E. Gottlieb
                   Renan F. Varghese

                  85 Fifth Avenue
                  New York, NY 10003
                  Telephone: (212) 257-6800
                  Facsimile: (212) 257-6845
                  dgottlieb@wigdorlaw.com
                  rvarghese@wigdorlaw.com
                  *Counsel for Plaintiff*